IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,                :
                                         :
                  V.                     :
                                         :    Case 1:01-CR-336-04
MARI ANTHONY,                            :
         Defendant                       :
                                         :
                                         :

```
                                      ┌──────────────────────────┐
                                      │   FILED                  │
                                      │   SEP 2 9 2003           │
     TRANSCRIPT OF PROCEEDINGS        │                          │
                                      │ PER                      │
             SENTENCING               │ HARRISBURG, PA. DEPUTY CLERK │
                                      └──────────────────────────┘
```

        BEFORE:    HON. SYLVIA H. RAMBO, Judge

        DATE:      September 11, 2003

        PLACE:     Courtroom Number Three
                   Federal Building
                   Harrisburg, Pennsylvania


COUNSEL PRESENT:

WILLIAM A. BEHE, Assistant United States Attorney
    For - United States of America

SANFORD ALAN KREVSKY, Esquire
   For - Defendant


                                      Vicki L. Fox, RMR
                                      Official Reporter

2

I N D E X

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| **Defendant's Witnesses** |        |       |          |         |
| 1. Mari Anthony          |        |       |          |         |
|   By Mr. Krevsky | 9    | --    | --       | --      |
|   By Mr. Behe  | --     | 21    | --       | --      |
| 2. Barry Daniels         |        |       |          |         |
|   By Mr. Krevsky | 34   | --    | 38       | --      |
|   By Mr. Behe  | --     | 38    | --       | --      |
| **Government's Witness** |        |       |          |         |
| 1. John Barrett          |        |       |          |         |
|   By Mr. Behe  | 39     | --    | --       | --      |
|   By Mr. Krevsky | --   | 41    | --       | --      |

3

1                             I N D E X

2     Defendant's Exhibit                Introduced    Admitted

3     1. Letter from Kyle Rude to Sanford        13          62
         Krevsky dated 8/15/03.
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1          THE COURT: Good morning, everyone.

2          MR. BEHE:  Good morning, Your Honor.

3          THE COURT:  The last time we were here in court,

4     or since then, I have addressed most of the objections

5     except one.  I addressed the obstruction enhancement, the

6     amount of the drugs, the acceptance of responsibility, the

7     possession of a gun.  And I did grant your motion on that

8     and took away the two level enhancement on the gun

9     possession I believe.

10          Criminal history calculation, the only thing that

11     was left was the allegation of incompetency of prior

12     counsel, the allegation being that he promised the defendant

13     that he would not receive anything more than a ten year

14     sentence.  That amended petition was filed on September 8th.

15     There is a memo in support of the motion which I just now

16     received.

17          I am ready to address that issue concerning Mr.

18     Rude's representation.  But not having read the memo, I will

19     permit counsel to make whatever argument that you have or

20     present any testimony.  That is the only issue here today.

21          MR. KREVSKY:  If it please the Court, Your Honor,

22     Stanford Krevsky on behalf of Mr. Anthony.  Your Honor, I

23     would like to present, if I could, testimony for my client

24     regarding the issue of counsel's representation.

25          I also would like with the Court's indulgence to

5

1    present a witness regarding what Mr. Chapman testified to

2    about the threat -- as a rebuttal witness on what

3    Mr. Chapman had said.

4            THE COURT:  Who is the rebuttal witness?  I want

5    the proffer.

6            MR. KREVSKY:  Basically, that Mr. Chapman said

7    that my client threatened him in the fall of 2002.  I will

8    present two witnesses on that regard.

9            Number one would be my client, who will testify

10   that in the fall of 2002, he was in jail.  And also, Your

11   Honor, I would hope to bring a Mr. Mari (sic) into court.

12   His counsel is here.  And Mr. Mari wanted his counsel here.

13   Mr. Perry, his attorney, was nice enough to come this

14   morning.  And Mr. Daniels I believe will testify that

15   Mr. Chapman told him at the prison that he was never

16   threatened by my client.

17           THE COURT:  You have got me confused.  You

18   mentioned three different people now.  Is Chapman here?

19           MR. KREVSKY:  Chapman is the gentleman, Your

20   Honor, that testified --

21           THE COURT:  The threat was made to whom?

22           MR. KREVSKY:  Was made by my client to him.

23           THE COURT:  To Chapman?

24           MR. KREVSKY:  Yes.

25           THE COURT:  Who is here to testify to the

6

1    contrary other than your client?

2            MR. KREVSKY:  A gentleman by the name of Barry

3    Daniels.  He was brought in from Dauphin County Prison.  The

4    other person that I mentioned was his attorney.  That is

5    Brian Perry.

6            THE COURT:  Mr. Perry is here for what reason?

7            MR. KREVSKY:  Because his client wanted him here.

8            THE COURT:  All right.  Mr. Behe?

9            MR. BEHE:  I didn't catch the name of the

10   witness.

11           MR. KREVSKY:  Barry Daniels.

12           MR. BEHE:  Your Honor, with regards to the time

13   frame, I believe I have sent Agent Barrett down to get the

14   DEA-6 of the interview of Mr. Chapman.

15           As Mr. Krevsky will recall, at the conclusion of

16   the proceedings, Mr. Chapman's statement about when he

17   thought the time frame was was incorrect, and Mr. Chapman

18   corrected that by saying whenever it was, it was after Mr.

19   Smith was in prison, which would have been at the end of

20   October.  The time frame I believe that he testified to at

21   trial and in previous reports to DEA when he interviewed him

22   about it would have been into the early part of the

23   following year, either January or I believe it was February.

24           THE COURT:  Can we get the years we are talking

25   about?

7

1          MR. BEHE:  Pardon me?

2          THE COURT:  May we have the years you are talking

3    about for the record?

4          MR. BEHE:  I am trying to recall what year it was

5    that Mr. Smith was incarcerated.  It was October of I

6    believe it was 2001.  I hope I am not mistaken.  That is

7    when he was arrested for the sales to Chapman.  It would

8    have been into 2002 that the threat occurred from this

9    defendant to Mr. Chapman.

10         THE COURT:  You are saying that it happened in

11   the fall of 2002?

12         MR. BEHE:  No.  Mr. Krevsky was using the

13   appropriate type of cross-examination, telling him exactly

14   when it was, when it would have occurred.  Mr. Chapman said

15   he thought it was sometime in the fall.

16         However on redirect, I asked him do you remember

17   exactly when it was?  No.  Would it have been within a week

18   or so of when you reported the incident?  He said yes.

19         After that, I told Mr. Krevsky he reported it to

20   us in either January or February.  So it couldn't have been

21   in the fall of the year.  I have sent Agent Barrett down to

22   get the report so we can have some historical context to it.

23         So if Mr. Anthony says he was in prison, I don't

24   think that is going to affect the matter at all.

25         With regard to the other inmate, I don't have any

Anthony - Direct                                    8

1   idea what he is going to say other than what Mr. Krevsky has

2   related today.

3                THE COURT:  Okay.  Let's go with the Rude issue

4   and reserve the Chapman issue a second.

5                MR. KREVSKY:  Thank you, Your Honor.  If it

6   please the Court, Your Honor, first of all, I would just

7   draw the Court's attention to the allegations that we have

8   made.  I have attached a letter -- sent a letter to the

9   Court.

10               THE COURT:  I have it.

11               MR. KREVSKY:  Thank you, Your Honor.  I also gave

12  a copy of the letter to Mr. Behe.  I would call my client

13  Mari Anthony.

14               THE COURT:  What is he taking up to the bench?

15               MR. KREVSKY:  They are his notes, Your Honor.

16               THE COURT:  Do you want to look at them,

17  Mr. Behe?

18               MR. BEHE:  I would like to.  I prefer he testify

19  from his own recollection.

20               MR. KREVSKY:  I don't have a problem with that,

21  Your Honor.

22

23

24

25

Anthony - Direct                                    9

1        MARI ANTHONY, called as a witness, being duly

2    sworn, testified as follows:

3

4        THE CLERK:  Would you state your name for the

5    record, please?

6    A    Mari Ali Anthony.

7        THE CLERK:  Thank you.

8                    DIRECT EXAMINATION

9    BY MR. KREVSKY:

10   Q    Good morning, Mr. Anthony.

11   A    Good morning.

12   Q    Mr. Anthony, there have been some allegations that

13   were initially addressed by you to me, and then we have

14   later brought to the Court through a formal motion that is

15   alleging that your previous attorney gave you information

16   that was erroneous.

17        Are you aware of the discussions you have had

18   with me about those?

19   A    Yes, I was.

20   Q    What I would like you to do, just for way of

21   background, who was your previous attorney?

22   A    Kyle Rude.

23   Q    Please spell his last name, if you can.

24   A    R-u-d-e.

25   Q    And Mr. Rude was engaged by you or your family

Anthony - Direct                    10

1    privately?

2    A    Yes.

3    Q    Do you recall when?

4    A    Maybe around May, 2002.

5    Q    Did Mr. Rude discuss with you the consequences of your

6    being indicted by the federal government?

7    A    Yes.

8    Q    Did you and he discuss what you were looking at in

9    terms of punishment, years?

10   A    Yes.  From the beginning, he really didn't state that

11   the government was like trying to get me to do anything.  As

12   time went on after the suppression hearing, after July, he

13   stated that I was looking at a ten year minimum.  He said if

14   I would plead out, I would like at a ten year minimum.

15   Q    Did he tell you if you went to trial what you would be

16   looking at?

17   A    Yes.  He said if he went to trial and I happened to

18   lose the trial, I would be looking at 20 to 25 years.

19   Q    So basically the first recollection of the

20   conversations you and he had indicated that there would be

21   -- if you would take a deal, it would be a ten year minimum?

22   A    A ten year minimum.  He told me I would receive ten

23   years, and I would still have my appeal rights.  This is in

24   September of 2002.

25   Q    Take your time here.  You would still have your appeal

Anthony - Direct                                    11

1    rights on the suppression hearing?

2    A     On the suppression hearing.

3    Q     So you would have a conditional plea.  Do you

4    understand what that is?

5    A     Yes.

6    Q     What is a conditional plea?

7    A     It means you can plea out and still have your appeal

8    rights.

9    Q     He explained that to you?

10   A     Right.

11   Q     Then he talked about that if you would plead, you

12   would have a ten year sentence or a ten year minimum; do you

13   recall?

14   A     He told me a ten year minimum and a ten year sentence

15   also.  That was our first conversation that we had.

16   Q     That was in September of 2002?

17   A     Yes.

18   Q     During that conversation, is that the conversation

19   that he told you that if you went to trial --

20              THE COURT:  Don't lead him.

21              MR. KREVSKY:  Pardon me?

22              THE COURT:  Don't lead hiem.

23              MR. KREVSKY:  I am sorry.

24   BY MR. KREVSKY:

25   Q     You indicated that there was discussions about a 20 to

Anthony - Direct                                    12

1    25 year sentence?

2    A      Yes.  That is if I would go to trial and lose the

3    trial, that is what he discussed with me.

4    Q      Okay.  Now that was in September of 2002?

5    A      Yes.

6    Q      Was there another conversation you had with Mr. Rude

7    that you recall where the two of you discussed what your

8    potential sentence would be?

9    A      I believe I came down here September 26th later on

10   that month of 2002 for the plea hearing.  And I asked him a

11   question whether the ten years had a cap on it.  And I

12   believe he asked Mr. Behe was it a cap on the ten years.

13   And I believe Mr. Behe said no.

14           So I asked Mr. Rude what would he try to give me

15   as far as the sentence.  I asked him were they trying to

16   give me a two to three year enhancement.  He said I would be

17   lucky to get that as far as the time.

18           And after he made that statement, he said I am

19   going to push for the ten year minimum.

20   Q      Did you have any other conversations with Mr. Rude

21   regarding what your anticipated sentence was?

22   A      Yes.  February 2003, I made a phone call to him.  I

23   asked him why was my psi taking so long.  He said he

24   believed the government wanted me to testify at Tyrone

25   Smith's trial.

1        I asked him what my guideline was on my plea.

2   And he told me I was looking at the 14 year range.

3   Q    This was while your psi is being conducted?

4   A    I asked him what was taking so long on the psi because

5   I did my psi right after I took the plea hearing in

6   September of 2002.  I talked to him again in February of

7   2003.

8   Q    All right.  At that point, there was a discussion

9   about a range, and he told you what was the range?

10  A    He told me a 14 year range.

11  Q    Now --

12           THE COURT:  This was after you entered your plea?

13  A    Yes.

14           MR. KREVSKY:  May I approach the witness, Your

15  Honor?

16           THE COURT:  Show Mr. Behe.

17           (Letter from Kyle Rude to Sanford Krevsky dated

18  8/15/03 was introduced as Defendant's Exhibit 1.)

19  BY MR. KREVSKY:

20  Q    Mr. Anthony, I am showing you a letter.  The letter

21  has been marked at least by me as Defendant Exhibit 1.  Are

22  you familiar with what that letter is?

23  A    Yes.

24  Q    Okay.  Just identify it for the record so they will

25  know.

                            Anthony - Direct                    14

1       A       It is a letter from Mr. Rude to your office.

2       Q       Have you seen that letter before?

3       A       Yes, I seen it yesterday.

4       Q       Did you understand the contents of the letter?

5       A       Yes, I understand.

6       Q       In there, it indicates on the last sentence that --

7       and I will quote -- I also advised him that he was facing a

8       ten year mandatory sentence.  When he asked me to provide

9       him with an estimate guideline range, I advised him he would

10      be likely -- lucky -- excuse me -- to keep it around 14

11      years.  Did you read that?

12      A       Yes.

13      Q       Is that true?

14      A       He stated that at the plea hearing as an issue.  When

15      he first came to me with the plea, he initially said I was

16      going to receive a ten year sentence.  When he came to the

17      plea hearing, he said something different.

18      Q       And what was that?

19      A       He said that -- I asked him the question what would

20      the government try to give me a two or three year

21      enhancement?  And he said I would be lucky to get that.

22      Q       So the two or three year enhancement, you were

23      thinking 12 to 13?

24      A       Correct.

25      Q       He said you would be lucky if you would get that?

Anthony - Direct                                    15

1    A    Correct.

2    Q    At any time -- do you know what you are facing right

3    now?

4    A    30 years.

5    Q    At any time, were you advised by Mr. Rude that you

6    were looking at 30 years?

7    A    No.  He told me that there was no evidence of a

8    conspiracy.  I told him from the beginning that I never

9    conspired.  He never mentioned the thirty years.  The only

10   time he mentioned anything over 20 years was if I would lose

11   the trial.

12   Q    Now there was also an indication by you during your

13   testimony earlier that on one of the occasions either Mr.

14   Rude or the government said that they wanted you to

15   cooperate; is that correct?

16   A    That was what Mr. Rude told me February 2003 in a

17   phone call.

18   Q    At your plea hearing, was there an indication whether

19   or not you should cooperate?

20   A    No.

21   Q    Was it part of your plea bargain that you needed to

22   cooperate with the federal government?

23   A    No.

24   Q    When was the first time you heard about your needing

25   to cooperate?

Anthony - Direct                                16

1    A      When Mr. Rude told me in February of 2003.

2    Q      After the plea?

3    A      Yes.  Mr. Rude made a statement.

4           THE COURT:  There is no question before you.

5    A      I'm sorry.

6    BY MR. KREVSKY:

7    Q      I am going to ask you this because it is probably

8    going to come up either by the government or by the Court.

9    At some time, however, during your plea in front of Judge

10   Rambo, questions were asked of you about what you

11   anticipated getting and whether any promises were made to

12   you; is that true?

13   A      Yes, I remember.

14   Q      And do you recall what you said to the Court?

15   A      I said no.

16   Q      Why did you say that?

17   A      Because I was really confused.  I really was confused.

18   Q      In discussions with Mr. Rude, did Mr. Rude ever

19   compare the time that you had served with either one of your

20   ages?

21   A      Yes.  During September, I believe it was September

22   13th, 2002, that is when I signed the plea, he told me that

23   I was going to get ten years, and it would be better if I

24   took a deal and still have a conditional plea.  He said

25   worse to worse, if I wouldn't win my appeal, I would be home

Anthony - Direct                               17

1    before the age he was.

2              I asked him how old was he, and he told me 35.

3    Q    How old are you?

4    A    I was 26 at the time.

5    Q    Did Mr. Rude ever indicate to you as to what the

6    government through its U.S. Attorney, and particularly

7    Mr. Behe, did he ever tell you what Mr. Behe was prepared to

8    recommend to the Court for a sentence for you?

9    A    All Mr. Rude told me is I was getting a ten year

10   mandatory minimum.  As far as like enhancements, at the time

11   that we had spoke, he told me that it shouldn't be no

12   enhancements because there was no evidence of a conspiracy.

13   That is what would enhance me.

14   Q    Did you plead to the conspiracy at the plea hearing?

15   A    Mr. Rude told me when he first -- when he showed me my

16   plea, I asked him was the plea for conspiracy.  He told me

17   about the December 6, 1998 date.  He told me I was pleading

18   out to the pull over which was April 24th.

19   Q    The what over?

20   A    The pull over.

21   Q    The stopping of the vehicle?

22   A    Correct.

23   Q    Did you have any intention ever of pleading to

24   anything other than the possession as a result of the motor

25   vehicle stop?

1    A      Never.

2    Q      Did Mr. Rude ever compare your anticipated sentence to

3    a poker game?

4    A      Yes.

5    Q      Tell us about that.

6    A      He said if you go to trial -- he asked me did I know

7    how to play poker.  I told him no.  He said if I would go to

8    trial, Mr. Behe was holding a ace over my head.  He said if

9    I would lose the trial, I would get 20 to 25 years.  If I

10   plead guilty, he would not put the 20 year mandatory minimum

11   paper.  That was his words.

12   Q      There is an indication that you made a threat to

13   Mr. Chapman; correct?

14   A      There was an indication.

15   Q      You heard him testifying; correct?

16   A      I heard him.

17   Q      Did you ever threaten Mr. Chapman?

18   A      No.  I never threatened Mr. Chapman.

19   Q      Do you know Barry Daniels?

20   A      I really don't know him.  Not really.

21   Q      Did you meet him at the prison, or did you know him

22   from the street?

23   A      I knew him.  I seen him around.  I really don't know

24   him as a person.  I seen him around.  I played ball with him

25   in prison.

Anthony - Direct                                    19

1    Q    When you made your plea before the Court, what was

2    your understanding of what you were going to get as part of

3    your sentence?

4    A    Mr. Rude during the plea hearing -- well, before the

5    plea hearing, that's when he was telling me about -- I asked

6    him about the two or three year enhancement.  He told me I

7    would be lucky to get that.  That is what he told me then.

8    So I was expecting that maybe I was going to get 12, 13, 14

9    years at the time when I took the plea,.

10    Q    Let me talk to you about acceptance of responsibility.

11    Did you discuss that with Mr. Rude?

12    A    At the time I did my psi, he told me to hold off on

13    it.

14    Q    He told you to hold off on it?

15    A    He told me to hold off on it.

16    Q    Did you see then the presentence report indicated that

17    you didn't provide one?

18              THE COURT:  You are starting now with a new issue

19    that I don't think has been raised.

20              MR. KREVSKY:  We did raise the acceptance of

21    responsibility issue before.

22              THE COURT:  Right.  But now you are saying that

23    counsel told him not to?  I don't think that was raised

24    before.

25              MR. KREVSKY:  He did testify to that.  We did

Anthony - Direct                                    20

1    bring it up in the objections to the presentence

2    investigation.

3              THE COURT:  I know you did, but I thought it was

4    in the form that you felt that he should have been given it,

5    not that counsel told him not to.

6              MR. KREVSKY:  That's correct.  I am not saying --

7              THE COURT:  Now, you are.

8              MR. KREVSKY:  I am not saying that he was

9    ineffective for telling him not to.  I am just trying to

10   explain to the Court so the Court understands my client's

11   approach to acceptance of responsibility.

12             THE COURT:  All right.

13             MR. KREVSKY:  Thank you.

14             THE COURT:  I already ruled on it, but I will

15   reconsider it.

16             MR. KREVSKY:  Thank you, Your Honor.

17   BY MR. KREVSKY:

18   Q    Mr. Anthony, in terms of accepting responsibility,

19   when you entered a plea before Judge Rambo, what was your

20   expectation in terms of accepting responsibility, for what

21   offense?

22   A    For the pull over on April 24, 2002.

23   Q    To this day, are you prepared to accept responsibility

24   for your involvement with conspiracies with a Mr. Dykes, a

25   Mr. Carter or a Mr. Pitts?

Anthony - Cross                                    21

1    A    No, I'm not. +

2    Q    Why is that?

3    A    Because I never dealt with any of them.  I never had

4    no conspiracy with any of them.

5    Q    Do you know all of them?

6    A    I know of Mr. Dykes through my son's mother and his

7    brother.  I really don't know Aaron Pitts.

8    Q    What about Mr. Carter?

9    A    I don't know Mr. Carter.

10             MR. KREVSKY:  I beg the Court's indulgence

11   please.

12   BY MR. KREVSKY:

13   Q    Did Mr. Rude indicate to you that -- strike that,

14   please.  Subsequent to your entering your plea, did Mr. Rude

15   indicate to you that your sentence might be enhanced because

16   you were not cooperating?

17   A    No.  He told me about enhancements for my prior -- no.

18   No.

19             MR. KREVSKY:  That is all I have.  Thank you very

20   much.

21             THE COURT:  Cross-examine.

22                      CROSS-EXAMINATION

23   BY MR. BEHE:

24   Q    Mr. Anthony, you realize, don't you, that your

25   sentence was not enhanced because you did not cooperate?

Anthony - Cross                                22

1    A     Say that again, Mr. Behe.

2    Q     You understand, don't you, that your sentence where it

3    stands now is not on the basis of an enhancement for not

4    cooperating; don't you?

5    A     Do I understand that it is not enhanced because I did

6    not cooperate?

7    Q     Yes.  What happened is that you didn't get a break for

8    not cooperating, but your sentence didn't go up because you

9    didn't cooperate; do you understand that?

10   A     I understand.

11   Q     Let me see if I can walk through your testimony to

12   make sure I understand it.  Your attorney told you that you

13   were facing a mandatory term of imprisonment of ten years?

14   A     Correct.

15   Q     Do you know what that means?

16   A     Yes, I know what it means.

17   Q     And your attorney told you that had you gone to trial,

18   there is a possibility you could be sentenced in the 20 some

19   year range; correct?

20   A     If I were found guilty.

21   Q     Of course.  If you were innocent, you wouldn't be

22   sentenced at all.  You understand that?

23         If you were convicted, you could be in the twenty

24   year range; correct?

25   A     That is what he says.

Anthony - Cross                                    23

1   Q      Before you even entered your guilty plea, you signed a

2   plea agreement that told you that you faced a mandatory

3   minimum term of ten years; correct?

4   A      Correct.

5   Q      And a possibility of up to life imprisonment; is that

6   correct?

7   A      I remember.

8   Q      Not only do you remember.  You signed that document;

9   didn't you?

10  A      Yes, I did.

11  Q      Now before you pled guilty, you are telling us that

12  your attorney told you that you would be lucky if you got a

13  sentence in the 14 year range; is that correct?

14  A      He told me after I asked him about the enhancement two

15  or three years, he told me that I would be lucky to get

16  that, yes.  That was before the plea hearing.

17  Q      You would be lucky if your sentence was as low as 14

18  years; is that correct?

19  A      As low as 12 to 13 years, correct.

20  Q      He said you would be lucky if that happened?

21  A      That is what he said.

22  Q      He told you that before you stood in front of the

23  Court and decided to plead guilty anyway; is that correct?

24  A      That is what he told me.

25  Q      Have you done a guideline calculation of your

Anthony - Cross                                          24

1    sentencing guidelines if the relevant conduct did not apply

2    in your case?

3    A      No.   That is when I called him in February of 2003.   I

4    asked him about the guidelines.

5    Q      No.   I am asking you have you done or did you and Mr.

6    Rude talk about what your guideline range would be if there

7    was no other enhancements and the Court did not consider

8    other drug trafficking activity as relevant conduct?

9    A      Excuse me.   He told me I would be at a 34 offense

10   level, and I would be in the maybe four, five, six range,

11   like on the top of the guidelines.

12   Q      You would be around 14 years if there wasn't any

13   relevant conduct consideration of other drug trafficking or

14   any other enhancement that the Court applied; you understand

15   that, right?

16   A      Can you say it again, Mr. Behe?

17   Q      If there was no other enhancement or your guidelines

18   didn't go up because the Court considered relevant conduct

19   and the Court considered only the drug amounts that were

20   found on April 24th, you would be around the 14 year range;

21   do you understand that?

22   A      I understand.

23   Q      Your lawyer I guess was advising you that it was his

24   opinion that the Court would not believe the information

25   about other drug trafficking and that your sentence if you

Anthony - Cross                                    25

1    were lucky would be based upon what you were caught with

2    when you were stopped an April 24th, 2002; is that correct?

3    A      Mr. Rude told me there was no evidence prior to April

4    24th of a conspiracy.

5    Q      Did you hear Judge Rambo at your change of plea tell

6    you specifically that if she finds that there was evidence

7    of other drug trafficking, that that would be considered

8    under relevant conduct?

9    A      That's the part I didn't understand.

10   Q      You seem to understand a lot.  What is there that you

11   didn't understand about that?

12   A      When she said relevant conduct, I thought I was just

13   taking a plea for April 24th.  And when you state I believe

14   at the plea hearing that there were witnesses saying we were

15   in a conspiracy, Mr. Rude prior -- like when he came to see

16   me, he told me when I went to a discovery meeting that there

17   was no witnesses.  There was one witness that I sold them

18   drug.  When I went to the plea hearing, it kind of threw me

19   off when you said there was more witnesses.

20   Q      I am asking you at the time that you entered your

21   plea, you and your attorney advised the Court that you were

22   admitting only to the conduct that occurred on April 24th;

23   is that correct?

24   A      Correct.

25   Q      You told the Court through your counsel that you would

Anthony - Cross                                     26

1    be contesting any other information that would be called

2    relevant conduct that might get you an increased sentence;

3    isn't that correct?

4    A    I can't remember that part there, Mr. Behe.

5    Q    You mean the part that might affect your case here

6    today you don't remember?

7    A    No.  I don't remember the part contesting the relevant

8    conduct.  I don't remember him really stating that.

9    Q    You don't remember Judge Rambo telling you that if she

10    finds this other information to be credible, that you are

11    going to lose acceptance of responsibility, and your

12    sentence could be enhanced under that relevant conduct?

13    A    I remember Your Honor saying if she finds there is

14    relevant conduct, my guidelines will change.  I don't

15    remember Mr. Rude saying he is going to contest relevant

16    conduct.  I don't remember him saying nothing like that.

17    Q    When you entered into your plea agreement, you told

18    Mr. Rude that you did not want to cooperate with the United

19    States; is that correct?

20    A    That's correct.  I told him I wanted to fight my case.

21    Q    You obviously changed your mind because you pled

22    guilty; correct?

23    A    I pled guilty to?

24    Q    To the charge that you are going to be sentenced on.

25    You obviously changed your mind and didn't fight your case

Anthony - Cross                                27

1    and you pled guilty?

2    A    I thought I was pleading guilty to a pull over.  He

3    told me I was not pleading guilty to no conspiracy.

4    Q    When you got a plea agreement from the government, Mr.

5    Rude made sure that there was no language in that plea

6    agreement that required you to cooperate; is that correct?

7    A    Mr. Rude really didn't read over the plea agreement

8    with me.  He just read the dates over with me, and he read

9    the conditional plea over with me, paragraph 14.

10   Q    Now you are alleging that counsel didn't even go over

11   the terms of the plea agreement with you?

12   A    Counsel told me -- this is what he did.  He took my

13   plea.  He took my plea bargain out, my plea agreement, set

14   it on the desk.  And he told me -- I asked him specifically

15   was I pleading guilty, was this for conspiracy?  And he said

16   you are not pleading guilty to these dates from December

17   6th, 1998 on up.  You are pleading guilty to April 24th,

18   2002.

19   Q    That was right.  You understand that?

20   A    I was just pleading guilty to April 24th, 2002.

21   Q    That's right.  Do you understand that?

22   A    Yes.

23   Q    You didn't plead to a conspiracy.  Do you understand

24   that?

25   A    No.  I wasn't pleading guilty to a conspiracy.

Anthony - Cross                                      28

1    Q    And you didn't.  Go ahead.  Continue with what counsel

2    did or didn't do with the plea agreement.

3    A    He said I was pleading guilty to April 24th, 2002.

4    And I flipped the page.  And I believe he ran over I think

5    it was paragraph 14 of my conditional plea.  He said we

6    still had appeal rights.

7    Q    That's true.  Are you saying that's all he did with

8    regards to the plea agreement?

9    A    That is what he did.

10   Q    So you didn't even go over the penalty provision?

11   A    As far as the ten year minimum to life?

12   Q    Yes.

13   A    I don't recall, Mr. Behe.

14   Q    Again in terms of what you are saying under oath here

15   today versus what you said under oath when you pled guilty,

16   when you stood before Judge Rambo and pled guilty, she

17   showed you a plea agreement, had the Clerk hand you the plea

18   agreement.  Do you remember that?

19   A    I believe so.

20   Q    What do you mean you believe?  You remember being

21   shown the plea agreement; don't you?

22   A    I believe I remember being shown the plea.

23   Q    Specifically, you were directed to look at the last

24   page, and you were asked if that was your signature; do you

25   remember that?

Anthony - Cross                                        29

1    A      I remember that.

2    Q      The Judge specifically asked you have you gone over

3    that entire document with your attorney, and you said yes.

4    A      I remember she saying turn to the back.  Your Honor

5    said turn to the back page where my signature is.  I don't

6    remember Ms. Rambo going over the whole plea.

7    Q      The record of the guilty colloquy says what it does.

8    There is a transcript of that.

9           Did you tell the truth when you were before the

10   Court and you pled guilty?  Did you answer the questions

11   truthfully?

12   A      Was I promised anything?

13   Q      All the questions, did you answer all the questions

14   that were put to you truthfully like you swore you would do

15   when you were placed under oath?

16   A      I can't remember all the questions exactly.

17   Q      You think you may have lied under oath?

18   A      No, I didn't lie under oath.

19   Q      What you have, Mr. Anthony -- and you correct me if

20   this doesn't sound right -- your attorney comes to you and

21   says that there's a possibility he could get you a sentence

22   in the ten to fourteen year range if you plead guilty; is

23   that correct?

24   A      Original conversation, he said ten years.

25   Q      Ten year mandatory minimum?

Anthony - Cross                                              30

1    A      That was September 13th, 2002.  The second time we

2    spoke was before the plea hearing.  That was September 26th.

3    Q      Go ahead.  I am sorry.

4    A      That is when I asked him -- that is when I started to

5    gather information as far as me saying about a ten year cap.

6    I believe that's when he asked you was it capped up that you

7    can remember.  He came over and told me no.  I said what are

8    trying to do, give me an enhancement of two or three years?

9    And Mr. Rude said I would be lucky if I get that.

10   Q      See if you remember this.  Did your attorney tell you

11   that because you insisted on a plea agreement that was a

12   conditional plea that allowed you to appeal the Court's

13   denial of your suppression motion that the United States

14   would not agree to a plea agreement where you would be

15   capped and still let you have your appeal rights, that you

16   would have a plea agreement where you had to plea open to

17   the charge and then you could pursue your right to appeal,

18   and that is why you would be lucky to look at 14 years; do

19   you know that?

20   A      I remember Mr. Rude coming to me.  He sent me a plea

21   agreement in the mail.  He asked me was I in agreement with

22   this.  That is what his letter was saying.  After that, he

23   came to see me September 13th.

24          When I first read the first -- I think it was the

25   first page, it already said I was in agreement.  I never

Anthony - Cross                                          31

1    agreed to a plea agreement.  I already said that I was in

2    agreement with this.

3            He told me about the ten year minimum conditional

4    plea, and I would receive -- he told me I would receive ten

5    years with a conditional plea.

6    Q    Now you were asked this question by Mr. Krevsky about

7    the information provided by all of the individuals who

8    claimed that you were involved with drug trafficking with

9    them -- Dykes, Pitts, all of those individuals.

10           You are denying all of the relevant conduct in

11   your presentence investigation report where other people

12   said you were involved in drug trafficking activities

13   earlier than April 24th, 2002; is that correct?

14   A    Yes.  I am denying that.

15   Q    You are saying that they are making that up?

16   A    I'm saying I am denying it.  I never dealt with these

17   guys.  Maybe these guys were trying to get out of trouble

18   themselves.

19   Q    You are saying you had no drug involvement at all

20   before the 24th or just with those individuals?

21           MR. KREVSKY:  I would like to object.  That is

22   not what the question was.  The question on direct

23   examination was I named three specific individuals that were

24   named in the presentence report.  I asked about those three

25   individuals.  And the answer to that was I was not involved

Anthony - Cross                                              32

1   with those.

2          So I think he is mischaracterizing what my client

3   said on direct examination.

4          THE COURT:  Rephrase your question.

5   BY MR. BEHE:

6   Q    Regardless of what you were asked on direct, are you

7   denying being involved in drug trafficking?

8          MR. KREVSKY:  I am going to object to that.  That

9   is outside the scope of what was brought up on direct

10  examination.

11         THE COURT:  I will sustain the objection.

12         MR. BEHE:  Then I have no additional questions.

13         THE COURT:  Anything on Chapman?

14  BY MR. BEHE:

15  Q    You are denying threatening Chapman?

16  A    Yes, I am.

17  Q    Do you know him?

18  A    No, I don't.

19  Q    You don't even know the man who sat here in court and

20  identified you?

21  A    I seen Chapman maybe two times on the news.  I don't

22  know Chapman, never had a conversation with him, never shook

23  his hand, never did nothing.  I don't know him.

24         MR. BEHE:  That is all.

25         THE COURT:  Who were the three people that you

Anthony - Cross                                    33

1    mentioned in your question?

2            MR. KREVSKY:  Mr. Carter, Mr. Pitts and Mr.

3    Dykes.

4            THE COURT:  1 know he was asked during the plea

5    colloquy concerning involvement with some people.

6            MR. KREVSKY:  If it please the Court, I believe

7    what he was asked during his -- the plea, the change of plea

8    was about Tyrone Smith, and he refused.

9            THE COURT:  No, there were two people.  I have to

10   find it here.  I asked him about two people.  One, he said

11   no, and the other one he said yes.

12           MR. BEHE:  It may have been Lawrence Johnson, the

13   other individual in the traffic stop.

14           THE COURT:  Do you have any redirect?

15           MR. KREVSKY:  That's the one, Your Honor.

16   Mr. Johnson was the one he was with during the traffic stop.

17   He did admit his involvement with him.

18           THE COURT:  Do you have any further questions?

19           MR. KREVSKY:  No, I do not.

20           THE COURT:  You may step down.

21           MR. KREVSKY:  If it please the Court, I would

22   call Barry Daniels.

23

24

25

Daniels - Direct                                          34

1              BARRY DANIELS, called as a witness, being duly

2      sworn, testified as follows:

3

4              THE CLERK:   Would you state your name, please?

5      A    Barry G. Daniels.

6              THE CLERK:   Thank you.

7                          DIRECT EXAMINATION

8      BY MR. KREVSKY:

9      Q    Good morning, Mr. Daniels.

10     A    Good morning.

11     Q    Mr. Daniels, you are currently incarcerated?

12     A    Yes.

13     Q    Where?

14     A    Dauphin County Prison.

15     Q    Did you ever meet me before?

16     A    Yes.

17     Q    How many times?

18     A    Once.

19     Q    That was at Dauphin County Prison?

20     A    Yes.

21     Q    Did I ask you if you had an attorney at that point?

22     A    Yes.

23     Q    What did you tell me?

24     A    I had an attorney Brian Perry.

25     Q    Did I ask you if you would feel comfortable if

Daniels - Direct                                    35

1    Mr. Perry were around when I would ask you questions?

2    A    Yes.

3    Q    What did you tell me?

4    A    Yes.

5    Q    Did I stop questioning you at that point?

6    A    Yes, you did.

7    Q    Do you know my client Mari Anthony?

8    A    Not really.

9    Q    Do you see him at the prison?

10   A    Last year when I was incarcerated, we had -- I was on

11   a different block, but we went to gym every morning.

12   Q    Just for your own satisfaction and certainly to let

13   the Court know, I am not going to ask you anything at all

14   except something about a man named Chapman.

15        Do you know Mr. Chapman?

16   A    Yes, I do.

17   Q    What is his first name?

18   A    Brian.

19   Q    How well do you know him?

20   A    Very well.  He's my first cousin.

21   Q    He is your first cousin?

22   A    Yes.

23   Q    Did you receive information from anyone regarding

24   threats that were supposedly made by Mr. Anthony to

25   Mr. Chapman?

Daniels - Direct                                                36

1    A      No.

2    Q      Did you ever discuss with Mr. Chapman any threats that

3    Mari Anthony made against him?

4    A      Yes.

5    Q      What if anything was said?

6    A      He told me the night it was supposed to happen, we was

7    down at my sister's house on South 13th Street.  He went to

8    the All Nighter.

9    Q      Who did?

10   A      My cousin Brian Chapman.  When he came back, he was

11   just like -- he saw Manny's people.

12           THE COURT:  Saw what?

13           MR. BEHE:  Manny's people I believe is what he

14   said.  Is that what you said?

15   A      Yes, sir.

16   BY MR. KREVSKY:

17   Q      Who is Manny?

18   A      I am not sure of his real name.

19   Q      Did he ever tell you anything -- is Manny Mari Anthony

20   if you know?

21   A      I don't think, no.

22   Q      Did he ever tell you that supposedly Mari Anthony

23   threatened him?

24   A      No, he did not.

25   Q      Did he tell you that he told people that Mari Anthony

Daniels - Direct                                    37

1    threatened him?

2    A      No, he didn't.

3    Q      Did he tell you who the people were that threatened

4    him at the All Nighter?

5    A      He never told me he was threatened.

6    Q      What did he tell you?

7    A      He told me whoever it was at the All Nighter, they was

8    just like -- it wasn't right telling on his cousin or

9    whoever it was.  There was no need for that.  There was no

10   need to tell on his cousin because he wasn't facing no time

11   or nothing, so what is the point in telling?

12   Q      Did he ever mention that anyone brandished a firearm

13   at that point?

14   A      No, no.

15   Q      If you recall, Mr. Daniels, do you remember when this

16   happened?

17   A      I am not sure of the month.  I know it was cold out.

18   It was winter.

19   Q      Do you remember what year?

20   A      It was 2002.

21   Q      And if you know, was it before Christmas?

22   A      It after Christmas.  It was beginning 2002.

23          MR. KREVSKY:  I beg the Court's indulgence, Your

24   Honor.

25

Daniels - Cross, Redirect                              38

1    BY MR. KREVSKY:

2    Q    In conversations you have had with your cousin

3    Mr. Chapman, did he ever indicate that he even knew Mari

4    Anthony?

5    A    No, no, he did not.

6    Q    You discussed this thing that happened at the All

7    Nighter with him, and he never brought up Mari Anthony's

8    name?

9    A    No.

10         MR. KREVSKY:  That is all I have.

11         THE COURT:  Cross-examine.

12                        CROSS-EXAMINATION

13   BY MR. BEHE:

14   Q    Mr. Daniels, you said it was Manny's people that

15   approached him there?

16   A    Yes.

17         MR. BEHE:  Thanks.  That is all I have.

18         THE COURT:  Redirect?

19                     REDIRECT EXAMINATION

20   BY MR. KREVSKY:

21   Q    And no threats were made?

22   A    No.

23         MR. BEHE:  That is a mischaracterization.

24         THE COURT:  I sustain the objection.

25

Daniels - Redirect, Barrett - Direct          39

1    BY MR. KREVSKY:

2    Q     Did Mr. Chapman indicate to you that anyone threatened

3    him that night?

4    A     No, he did not.

5          MR. KREVSKY:  That is all I have.

6          THE COURT:  Recross?

7          MR. BEHE:  No.

8          THE COURT:  You may step down.  Anything further?

9          MR. KREVSKY:  I believe that is all, Your Honor.

10         THE COURT:  Mr. Behe?

11         MR. BEHE:  I would like to call Special Agent

12   Barrett.  He didn't anticipate being a witness.

13         THE COURT:  I understand.

14         MR. BARRETT:  Excuse my appearance.

15

16         JOHN BARRETT, called as a witness, being duly

17   sworn, testified as follows:

18

19         THE CLERK:  Would you state your name, please?

20   A     John M. Barrett.

21                    DIRECT EXAMINATION

22   BY MR. BEHE:

23   Q     You are a Special Agent with the Drug Enforcement

24   Administration; is that correct?

25   A     Yes.

Barrett - Direct                    40

1    Q    And were you involved in the investigation into the

2    drug trafficking activities of Tyrone Smith, Junior, Mari

3    Anthony, Lawrence Johnson and others?

4    A    Yes, I was.

5    Q    Did you have an opportunity to interview a Brian

6    Chapman concerning allegations he was making about being

7    threatened by Mari Anthony and other unknown individuals if

8    you were to cooperate and testify against Tyrone Smith?

9    A    Yes, I did.

10   Q    Will you tell us please when you interviewed

11   Mr. Chapman and he made those allegations?

12   A    I interviewed Mr. Chapman on February 21st, 2002.

13   Q    And did he tell you how recently that incident was

14   supposed to have occurred in relation to when you

15   interviewed him?

16   A    Yes.  Mr. Chapman stated on February 21st, 2002 that

17   this incident happened one and a half to two weeks prior,

18   either on a Friday or Saturday night at approximately twelve

19   midnight or 1:00 AM the following morning.

20   Q    So maybe around the 12th, 13th or something of

21   February?

22   A    Yes.

23   Q    Of 2002?

24   A    Correct.

25        MR. BEHE:   That is all I have.

Barrett - Cross                                    41

1       THE COURT:  Cross?

2                       CROSS-EXAMINATION

3   BY MR. KREVSKY:

4   Q     Agent Barrett, did you do anything to check out the

5   whereabouts of my client at that period of time?

6   A     No, I did not.

7   Q     At any time, did you confront my client with the

8   indication that he had supposedly threatened Mr. Chapman?

9   A     No.

10  Q     If you recall, did you ask Mr. Chapman why he didn't

11  report the incident sooner?

12  A     No, I did not.

13  Q     And your involvement with Mr. Chapman was what prior

14  to that point?

15  A     I am sorry?

16  Q     Did you have any involvement with Mr. Chapman prior to

17  that point?

18  A     Yes, I did.

19  Q     That was as a result of what?

20  A     I'm sorry.  Not as a result of anything.  Could you

21  rephrase your question?

22  Q     I'm sorry.  You had contact with Mr. Chapman prior to

23  the 21st of February?

24  A     Yes, I did.

25  Q     In what capacity did you have contact with him?

Barrett - Cross                    42

1    A    Mr. Chapman was a confidential source for the Dauphin

2    County Drug Task Force.

3    Q    Is it also fair to say that Mr. Chapman was in trouble

4    himself?

5    A    Mr. Chapman had pending charges from the Dauphin

6    County Drug Task Force.

7              MR. KREVSKY:  That is all I have.  Thank you very

8    much.

9              THE COURT:  Any redirect?

10             MR. BEHE:  No redirect, Your Honor.

11             THE COURT:  You may step down.

12             MR. BEHE:  I have no other witnesses either.

13             THE COURT:  I will listen to argument.

14             MR. KREVSKY:  Your Honor, I know this is unusual,

15   but could I ask Agent Barrett one last question?

16             THE COURT:  You can do it from there.

17             MR. KREVSKY:  Thank you very much.

18   BY MR. KREVSKY:

19   Q    Officer Barrett, did Mr. Chapman indicate to you as to

20   whether or not he knew my client from before?

21   A    Yes, he did.

22             MR. KREVSKY:  Thank you.

23             THE COURT:  Argument?

24             MR. KREVSKY:  One last witness, Your Honor.

25             THE COURT:  Is this rebuttal?

43

1          MR. KREVSKY:  No.  This would be my client's

2    father.

3          THE COURT:  For what reason?

4          MR. KREVSKY:  In terms of what Mr. Rude may have

5    told him.

6          THE COURT:  Mr. Behe?

7          MR. BEHE:  I don't know how that impacts on what

8    Mr. Anthony has testified to already as to what he claims

9    went into his decision making process.

10         THE COURT:  I will deny the request.

11         MR. KREVSKY:  I would like to make argument to

12   the Court if I could.

13         THE COURT:  Go ahead.

14         MR. KREVSKY:  Is the table appropriate, Your

15   Honor?

16         THE COURT:  That is fine.

17         MR. KREVSKY:  Your Honor, Judge, basically, what

18   this comes down to is some of the things that we have cited

19   in the brief that was presented to the Court.  And I guess

20   let me just start with this, Judge.

21         I think that what my client was anticipating --

22   and let's assume that he is a hundred percent right in terms

23   of what Mr. Rude told him, and that is that he would be

24   lucky if he would get the two to three year enhancement

25   which would put him up to 12 to 13.  Let's assume that the

44

1    luck wouldn't be there, and he could get six more years.

2    That puts him up to 18 or 19.

3           Let's even give him another three or four years

4    because he got bad luck.  That puts him up to 22.  He is

5    facing 360 months incarceration, which is way out of line

6    with what his expectations are.

7           I don't think it is unrebutted that my client's

8    worst case scenario according to counsel would have been 20

9    to 25 years if he went to trial.  He didn't go to trial.

10   And now he is looking at ten or fifteen years more than that

11   scenario.

12          I believe, Your Honor, that one of the cases that

13   we quoted indicates that it would be a denial of due process

14   to the extent that to receive a sentence like that would

15   shock the conscience of a person in terms of what he or she

16   expected to receive.

17          THE COURT:  I am sorry.  I don't follow you.

18          MR. KREVSKY:  That if a person negotiates a plea

19   and receives something that is so inconsistent with what

20   counsel told him or her that they were to receive, that

21   would shock -- I think was the wording -- it would shock the

22   universal sense of justice.  It would be fundamentally

23   unfair to have a person being advised that this is what you

24   are looking at, and then this is what you receive

25   afterwards.

45

1          Judge, I have read the colloquy.  I have been
2     privy to a lot of colloquys before.  And a lot of people are
3     in front of the Court and make statements to the Court that
4     they understand things and they don't fully understand
5     things.
6          I don't think that is the be all, end all that
7     there was a colloquy with the Court and that my client fully
8     understood it.
9          As an example of that, Judge, I would like to go
10    to the guilty plea colloquy.  At some point, the Court and
11    my client were having a dialogue, and you are trying to tell
12    him that relevant conduct would be considered.
13         He and Mr. Rude are trying to argue to the Court
14    that he only wants to plead guilty to the possession with
15    intent that occurred on the day of the stop or as he calls
16    it the pull over.
17         And here is what the Court ends up saying to my
18    client on page 18 of the guilty plea.  Mr. Rude says to the
19    Court:  It is not the amounts, Your Honor.  It is the time
20    period and the persons with whom he is alleged to have
21    conspired, aided and abetted.
22         The Court:  I will accept the plea.  If I find
23    that you were involved in more than this, you realize it is
24    going to impact on your sentence, the amounts?
25         The amounts weren't in question.  The amounts

46

1    weren't in question.  Does that mean that the amount of the

2    drugs, Your Honor, or does that mean the amount of the

3    sentence that he is to get.  I honestly don't --

4              THE COURT:  It is the amount called for under

5    Count 2 as an aider and abettor.

6              MR. KREVSKY:  But what he was saying is I was not

7    involved in that.  That is what he was trying to explain to

8    the Court, and that is what his attorney was trying to say

9    to the Court, that I wasn't involved in that.  That's where

10   I think the confusion came in.  That's why we are here.

11             THE COURT:  There is no confusion as to what

12   count he pled to.  There is no confusion several times

13   throughout the colloquy that he was advised that he had a

14   mandatory minimum of ten with a maximum of life.

15             MR. KREVSKY:  That's a given.  I understand that,

16   and I think my client --

17             ·  THE COURT:  Several times.  He was asked whether

18   he had any questions about that.  He was also told -- he was

19   also asked has anyone promised you any other sentence, and

20   he says no.

21             Then I also advised him if anyone has suggested

22   to him a sentence that is contrary to what the Court finds

23   after the presentence report, he couldn't withdraw his plea.

24   That is all in there.

25             MR. KREVSKY:  He wasn't advised of something

47

1      contrary.  He was advised something that would be within

2      that mandatory term.  That is what he is telling the Court.

3              THE COURT:  I said if it is contrary to what the

4      Court finds is applicable to him.  I also told him that the

5      guideline would not be known until after his presentence

6      report was completed.  And if anyone had suggested a

7      guideline contrary to what the Court finds, he could not

8      withdraw his guilty plea.  That is in there.

9              MR. KREVSKY:  I understand, Judge.  I understand

10     that.  Judge, I would like, if you wouldn't mind, if you

11     would just at least consider the cases that we have brought

12     to the Court's attention including the Strickland case, the

13     Gillis case and the Baker case.

14             THE COURT:  The Gillis case is distinguishable.

15     In that case, right in front of the State Attorney and in

16     front of the Court, there was an affirmation by defense

17     counsel to the defendant that he would be entitled to parole

18     I believe even though he had a life sentence which the Court

19     and the prosecutor knew was in error.

20             MR. KREVSKY:  Correct.

21             THE COURT:  We don't have that here.

22             MR. KREVSKY:  We don't have that part of it here.

23     That we don't have, Your Honor.  But we do have is what they

24     did is they tried to establish a standard, and the standard

25     if there was grossly erroneous information.

48

1    And if he was told that the government was

2    recommending that he receive somewhere in the ball park of

3    figure 12 to 18 years, something even in that ball park and

4    he does not get that and doesn't go to trial as a result of

5    that and ends up with thirty years, he was prejudiced.  And

6    that is the second prong of that standard that was outlined

7    in that case.

8    That is what I am arguing.  I understand that in

9    that particular case, it was distinguishable because the

10   statute had changed and the information that was given to

11   him was clearly erroneous by -- the Judge didn't have it

12   together.  The prosecutor didn't have it together, nor the

13   defense attorney.

14   It is the standard that I am talking about that

15   they used in that case, Your Honor, for the ineffective

16   assistance of counsel.

17   Again, Your Honor, particularly I guess in the

18   baker case, they indicated that if the erroneous information

19   was not given, then a different result could have occurred

20   for the client.

21   THE COURT:  What would have been the different

22   result?

23   MR. KREVSKY:  He could have gone to trial.  He

24   could have gone ahead and introduced information either

25   through his own witnesses or testimony that Mr. Chapman was

49

1   lying.  And I think if they would have found that he was

2   lying and the information that Mr. Chapman was wanted or had

3   charges pending against him and was trying to cut a deal for

4   himself and to tell on my client as well as the other

5   people, at least according to my client's unrebutted

6   testimony, three people provided information, two of which

7   he didn't even know.  Two of whom he didn't even know.

8           If he could have brought that out during trial,

9   he could have maybe won that trial.

10          THE COURT:  On just that issue?

11          MR. KREVSKY:  Judge, I don't know what the jury

12  would have found.  I don't think anybody can say that.

13  Stranger things have happened.

14          They may have found that they were offended by

15  the search, even though the Court would have allowed the

16  information to come in about the suppression of the evidence

17  and the Court allows it in, maybe the jury would have been

18  offended by it and maybe the jury would have done whatever

19  they would have done and found them not guilty.  We don't

20  know that.

21          But we do know that he is presented evidence that

22  witnesses against him had a reason to lie.  And also that at

23  least one of the people -- and the Court found that my

24  client might not even have had a gun in a situation when

25  somebody testified before the Grand Jury and before the

50

1    trial that my client had a gun.

2           So for those reasons, I think that he should be

3    allowed to withdraw his guilty plea.  And I would ask the

4    Court to so find.

5           THE COURT:  Mr. Behe?  First of all, I don't

6    think the initial allegation on which this motion was

7    founded, that is that he was promised a ten year term is no

8    longer an issue.  I think by his own testimony, he was

9    advised that it was a mandatory minimum.  So address the

10   other issues.

11          MR. BEHE:  Your Honor, I will try and work my way

12   back from the most recent allegation that is freshest in my

13   mind.

14          Mr. Krevsky confuses some things.  The Court did

15   not conclude that Marcus Carter was not credible on the

16   issue of the gun.  Your Honor simply examined the trial

17   transcripts and ruled that there was no testimony at trial

18   that there was ever a gun in a car.

19          That does not mean that the DEA did not interview

20   him, that that was information that he provided the DEA that

21   we provided to the Probation Department.

22          We are simply relying on testimony at trial.  So

23   there was no finding by the Court that he is not credible.

24   Your Honor's memorandum said there was no trial testimony on

25   the issue of a gun.

51

1        I will dismiss Mr. Daniels' testimony.  If

2   anything, Barry Daniels' testimony corroborates Mr. Chapman.

3   An incident so remarkable must have occurred that

4   Mr. Chapman told Mr. Daniels about going to the All Nighter

5   and being approached by Manny's people.  He was told not to

6   testify against him.

7        Whether he says Mari Anthony or not, Manny is

8   Tyrone Smith.  The incident was obviously so remarkable that

9   he brought it to his attention.  Everything else is classic

10  negative hearsay.  Were you told this?  No.  Did he say

11  this?  No.  It doesn't mean it didn't happen.  It just means

12  that there was no discussion about it.

13       Mr. Daniels' testimony does nothing to affect

14  Mr. Chapman's credibility.  In fact, a number of witnesses

15  testified at the trial of Tyrone Smith that Smith had said

16  that he was going to send people out to approach Chapman, to

17  get him not to testify.

18       However, the most important issue is whether

19  there would be a basis, a fair and just reason to allow this

20  defendant to withdraw his guilty plea.  I respectfully

21  suggest that there is none.

22       This is a classic case of an individual's

23  disappointed expectations about the sentence he is going to

24  receive driving his motion to get out of the guilty plea

25  that he knowingly and intelligently and voluntarily entered

52

1    in this particular case.

2           I think Mr. Rude's letter, brief as it is, is

3    instructive on this.  Because in that letter, he says he did

4    not advise the defendant that the government would recommend

5    a sentence of ten years.  He told him that I would not file

6    a motion to get a mandatory twenty years, which is correct.

7    And that he would be lucky if he got a sentence anywhere

8    around 14 years.

9           From that, I can divine that Mr. Anthony must

10   have been told that his sentence could very well exceed 20

11   years.  That is why they negotiated there not being an

12   information filed by the government to get a mandatory

13   minimum of twenty years based on his prior felony drug

14   conviction.

15          There would be no reason to discuss that if that

16   were not the expectation that the sentence could exceed 20

17   years.  This also suggests to me that by entering a

18   conditional plea, Mr. Rude told his client that he would be

19   lucky if his guideline range were based on solely the amount

20   of drugs that were involved in the April 24th, 2002 traffic

21   stop.  That would have kept it around maybe the 14 year

22   range.

23          And Your Honor specifically told the defendant

24   that at the time of the change of plea, that the relevant

25   conduct would apply.

53

1          We have to have some confidence in sworn

2     testimony or sworn answers given by a defendant when under

3     oath before the Court and asked about the voluntariness of

4     the plea, the understanding of the potential consequences.

5          It would simply undermine the entire guilty plea

6     process if in a case that is so clear as this that the

7     defendant could come in and make the arguments that he does

8     here today.

9          There is absolutely no testimony even from the

10    defendant that the government promised him any particular

11    sentence.  This is just his disappointed expectations about

12    what would happen, his gamble that relevant conduct would

13    not be accepted as credible.  And his guideline range is

14    well deserved and appropriate.

15         I did not have Mr. Rude here today because I did

16    not expect a hearing.  I don't think based on this record

17    that it would have been necessary in any event.  Thank you.

18              THE COURT:  We will take a ten minute break.

19              THE CLERK:  Court is in recess.

20              (A recess was taken.)

21

22

23

24

25

54

1                         AFTER RECESS

2              THE COURT:  Please approach.  With regard to what

3    I consider the renewed objection on the Chapman threat, the

4    Court maintains its original decision.

5              With regard to the incompetency of counsel, first

6    of all, I find that counsel did not promise him a maximum of

7    ten years or a minimum of ten years.  Nor do I find that Mr.

8    Rude promised him a cap on his sentence.  I believe the

9    letter that he wrote certainly defies that argument that he

10   promised a cap.

11             Furthermore, I believe that the defendant fully

12   was aware of the potential sentence.  It was set forth in

13   the plea agreement, which he signed.  The plea agreement was

14   explained in court.

15             He was asked whether there were any questions

16   concerning the plea agreement.  He was also asked in the

17   plea colloquy at pages 6, 8 and 9 and also advised of his

18   maximum sentence on what the sentence potential was, whether

19   he had any promises of a sentence other than what was stated

20   by the Court, to which there was a negative reply.

21             He was also asked whether he had any questions

22   concerning the plea agreement and the sentence he was to

23   receive.

24             Also I think it is important to note I believe

25   somewhere in his testimony he made mention of a discussion I

55

1    think of an offense level of 37 that was discussed between

2    him and counsel or maybe it was 34.

3         But in any event, by his own conduct in this

4    case, he put himself into a career offender category of a

5    level 37, category six which would have given him the same

6    sentence that he is facing now.

7         So even without the enhancements, he would be

8    facing a potential sentence.

9         Do you wish to speak on his behalf?

10        MR. KREVSKY:  Just briefly, Your Honor.  First of

11   all on behalf of my client and his family, his family is

12   here, Your Honor.  I imagine you have seen them.  His mother

13   is here.  His father is here.  Two of his aunts are here,

14   his sister and a cousin.

15        But on behalf of my client, I would wish to thank

16   the Court for giving us the access you have to this Court to

17   make the arguments we have had.  And some of the requests

18   were unique and not as timely as the Court would have

19   wanted.  I appreciate your giving us the opportunity.

20        Regarding the Court's decision, I understand the

21   Court's holding on that; although, I would ask the Court to

22   consider the objections we made regarding sentencing.

23        To the extent that the Court does have

24   discretion, I have outlined all the things I wanted to say

25   to the Court and to the Probation Office in two sets of

56

1    objections that we have outlined.  And the Court has

2    addressed most of those.

3              THE COURT:  Which ones haven't I?

4              MR. KREVSKY:  You have addressed them.  You have

5    addressed them.  I'm sorry.

6              And basically I put our position forward.  I do

7    think, Your Honor -- just briefly before I close, I do think

8    that it was his responsibility to accept the consequences of

9    what he did on the date that he was pulled over, and I think

10   he has done that.

11             I think it has been a bone of contention between

12   the United States Attorney and this Court in terms of how

13   far my client was willing to go to accept other relevant

14   conduct, and he has not done that.

15             I have asked the Court to understand that some of

16   the confusion I think that arose was because of that

17   disagreement, or the fact that he didn't realize how much

18   the other things would come into play in terms of what he is

19   facing now.

20             I do understand, and I think he understands, in

21   terms of his actions putting himself in the situation.  But

22   what I think that he understood, Your Honor, about relevant

23   conduct that the Court would consider would be his conduct,

24   what he did and his past, what he did to get himself in

25   trouble, but not anything involving any of these other

57

1    individuals.

2           The threat, I don't think he did understand that.

3    But the Court has made its ruling on that.  He is prepared

4    for sentencing.

5           Is there anything you want to say to the Judge?

6           THE COURT:  You have a right to talk on your own

7    behalf.

8           THE DEFENDANT:  I would like to say I apologize.

9    I apologize to the Court and my family, taking everybody

10    through this ordeal.  I would just like to apologize for

11    this whole situation.

12           I do have a son and daughter at home.  I don't

13    want to be taken away from their lives for the rest of my

14    life.  I do want to share something with them.

15           I just ask I not be sentenced to the maximum, but

16    to the minimum.

17           THE COURT:  You do understand that you do have

18    the right to appeal the suppression decision of the Court

19    and any decisions that the Court made on your objections to

20    the presentence report; do you understand that?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Mr. Behe?

23           MR. BEHE:  Yes, Your Honor.  The sentence called

24    for in this particular case is quite severe, a range of

25    thirty years to life.

58

1        But I don't see before the Court an individual

2   who is the slightest bit remorseful for his conduct.  He is

3   a career offender.  He hasn't learned anything from his

4   prior convictions and periods of incarceration and was

5   involved for a substantial period of time in distributing

6   substantial amounts of drugs in our community.

7        Indeed, the amount of drugs that were recovered

8   from the van from his town home during that incident on the

9   24th, the fact that the evidence showed that powder cocaine

10  had been converted into crack cocaine to me indicates an

11  individual who at that time was involved in substantial

12  distribution of controlled substances.

13       There comes a point in time where the community

14  just has to be protected.  Congress has determined that when

15  an individual comes before the Court having shown an

16  absolute unwillingness to reform and conform to the laws of

17  the United States and not involve himself in drug

18  trafficking, that the only appropriate thing to do is remove

19  that individual from the community for a substantial period

20  of time.

21       That is what will happen here.  I don't think

22  anything beyond the term of imprisonment of 360 months is

23  warranted, but I think a substantial term of imprisonment

24  like that is in fact well deserved.

25

59

1    THE COURT:  AND NOW this 11th day of September,

2    the year 2003, the defendant appearing in court for purposes

3    of sentencing, pursuant to the Sentencing Reform Act of

4    1984, it is the judgment of the Court on Count 2 that the

5    defendant Mari Anthony is hereby committed to the custody of

6    the Bureau of Prisons to be imprisoned for a term of 360

7    months.

8    The Court finds that the defendant has some

9    ability to pay a fine below the guideline range.

10   Accordingly, it is further ordered that the defendant pay to

11   the United States the sum of $2600.00 consisting of a fine

12   of $2500.00 and a special assessment of $100.00.

13   The fine and assessment are due immediately,

14   shall be paid through the Clerk of Court and are payable

15   during the period of incarceration with any balance to be

16   paid within five years of the defendant's release from

17   custody.

18   Upon release from imprisonment, the defendant

19   shall be placed on supervised release for a term of five

20   years.

21   Within 72 hours of release from the custody of

22   the Bureau of Prisons, the defendant shall report in person

23   to the Probation Office in the district to which he is

24   released.

25   While on supervised release, the defendant shall

60

1    comply with the standard conditions that have been adopted

2    by this Court and with the following additional condition:

3         Defendant shall pay any balance of the fine

4    imposed by this judgment to which remains unpaid at the

5    commencement of the term of supervised release in minimum

6    monthly installments of no less than $50.00.

7         As a condition of supervision, the defendant

8    shall submit to one drug test within fifteen days of release

9    from custody and at least two periodic drug tests

10   thereafter.

11        The following statement of reasons is placed on

12   the record for the sentence that has been imposed:  The

13   Court adopts the factual finding and the guideline

14   application in the presentence report except the Court finds

15   inadequate proof to support paragraph 20 of the presentence

16   report, which is the gun possession.

17        A total offense level is therefore 40, criminal

18   history category of six, with an imprisonment range of 360

19   to life.  The fine is below the guideline range because of

20   the defendant's inability to pay.  The sentence is within

21   the guideline range, that range exceeds 24 months.

22        The sentence is imposed for the following

23   reasons:  A sentence at the bottom of the range would appear

24   to meet the sentencing objectives.

25        Now, Mr. Anthony, you can appeal your conviction

61

1       if you believe that your guilty plea was somehow unlawful or

2       involuntary, or there is some other fundamental defect in

3       these proceedings that was not waived by your guilty plea.

4               You also have a statutory right to appeal your

5       sentence under certain circumstances, particularly if you

6       think the sentence is contrary to law.

7               You have ten days from this day in which to file

8       a notice of appeal.  If you wish to take an appeal and you

9       can no longer afford to retain the services of Mr. Krevsky,

10      the Court on proper application will appoint a Public

11      Defender to take an appeal for you without cost.

12              You may also request the Clerk of Court to

13      prepare and file a notice of appeal on your behalf.

14              Now if he does wish to take an appeal and he

15      cannot afford to retain your services, the Court needs to

16      know as soon as possible so that a PD can be appointed to

17      represent him.

18              MR. KREVSKY:  I will take care of it.

19              THE COURT:  Thank you.

20              MR. BEHE:  Your Honor, I ask that the second

21      superseding indictment and the remaining counts of the third

22      superseding indictment be dismissed.  I think he pled guilty

23      to Count 2 --

24              THE COURT:  Count 2 --

25              MR. BEHE:  -- of the third superseding.

62

1          THE COURT:  All other counts are dismissed.

2          THE CLERK:  Court is in recess.

3          MR. KREVSKY:  Could this be admitted into the

4     record?

5          THE COURT:  Yes.  Thank you.

6          (Defendant Exhibit 1 was admitted into evidence.)

7          (Whereupon, the proceedings were concluded.)

8

9          I hereby certify that the proceedings and

10    evidence are contained fully and accurately in the notes

11    taken by me on the trial of the above cause, and that this

12    copy is a correct transcript of the same.

13

14                    _Vicki L. Fox, RMR_

15                    Vicki L. Fox, RMR

16                    Official Reporter

17

18

19          The foregoing certification of this transcript

20    does not apply to any reproduction by any means unless under

21    the direct control and/or supervision of the certifying

22    reporter.

23

24

25